I'm here on behalf of the Saliers, and it's our contention that they had every reason to be shocked and mortified when Walmart and Hy-Vee substituted the medical judgment of a person to whom they never referred or went to for health care for that of their licensed physician, Dr. James. I know you're familiar with the facts. They'd gone to someone to get the treatment. That doctor examined them. That doctor applied his or her judgment to what they saw, consulted whatever literature was appropriate in their view, and gave a prescription. The Saliers presented it to Minnesota pharmacists. The pharmacists declined to fill it, in the Walmart case, this after consultation with the physician. So we don't quarrel with a statute that gives pharmacists a look-back responsibility on prescription authority. Is something contraindicated? Is it a mistake? Is it too much? Is a person shopping for Title II items by going with repetitive and different pharmacists or physicians? We don't quarrel with that. But where a physician goes to a pharmacy and says, well, that's not ministerial. No. We're saying that it— You're no—what does no mean? Yes, you're conceding or— No, I'm not conceding that. Well, they're licensed professionals. There's a difference between— Because of the functions that you named, plus others. They're not health care providers of the same— Different. Of the same rank as a physician. And so there's a difference between Walmart and Hy-Vee. It doesn't make it ministerial. The pharmacist clerk at the cash register, his or her duties may be ministerial, but the pharmacists are not. We disagree for the following reason. In any case, it says pharmacists are not—their professional functions are ministerial under the law. There is no case, and this is why we think it needs to go to the Minnesota Supreme Court. There is a fundamental distinction between the behavior of Walmart and Hy-Vee. The—Walmart consulted with the physician. And the strong case for our position is that in that instance, the pharmacist's role became ministerial. Hy-Vee did not consult with the physician, and therefore, the application, it is a non—it is a non-ministerial act. And so there's a distinction with difference as to the two pharmacists. The Sawyers had no relationship with the pharmacist. They have under the Minnesota Constitution, you know, a right to privacy and bodily integrity. There are cases that say that out of Article I, Section 2. When you go to a physician and you consult with them, you get advantage of a privilege recognized in State and Federal law, and you reveal confidential information to the physician in reliance on that confidence. The physician examines you, prescribes something, and says, you can—and that script becomes fillable at any licensed pharmacy. When that script is presented to a pharmacist, if the pharmacist has suspicions, they use discretion. And that discretion is to check it out. When the doctor calls the physician or the pharmacist and explains his reasons, in our view, that's the hard case, and that's the—which is the easier case for us. The pharmacist acts become ministerial. So that's why— Again, but what authority do you have for that proposition? I think I heard you say you don't have any. I don't. No. And so, you know, obviously, we erred in our choice of forum. We could have gotten a direct appeal to the Minnesota Supreme Court had we gone to Minnesota State court, but we came to Federal court and were bound by that election. That, you know, our choice of a Federal forum was dictated, I suspect, in large part by our—their coming to out-of-State counsel, where we chose a forum where we knew the rules, or at least thought we did. And we'll have to accept that and live with the consequences. But we don't think that this is a no-claim case and that the district court's dismissal of this by referring to Kornfeld as—the Kornfeld language as a fragment of sloppy dicta was an abdication of the court's role to consider seriously what informed consent is sounded in. It is sounded in a sense of bodily autonomy and bodily integrity and the right to privacy. And these are all things recognized under Minnesota law. And so, in our request for certification to the Minnesota Supreme Court, we'd like the opportunity to make that claim because the issue raised here is a non-frivolous issue. Is there a case in our circuit where we've ever reversed a district judge for declining to certify a question to the Court of Appeals? If there is, I missed it. I've not seen it, sir. And, you know, I didn't say I'd come here from Connecticut for easy. I brought the smog with me yesterday. I got out of the plane. I said, I thought that left the Northeast two days ago, but here it was again. No, there's not. But, you know, I think the case is extraordinary. And we loaded up our brief early on with a discussion of what happened in COVID. You know, the Laboratory of Democracy dicta from Judge Brandis, I believe it was, is important. States experiment. The Federal courts take their guidance from those experimentations and the results of those experiments. No state has recognized a right to bodily autonomy in these contexts, but these cases are new. And so, with respect to Ivermictin, there was a robust controversy. And our complaint is, even though it's notice pled in Federal court, we loaded it up with facts to alert the court that this wasn't a physician who was off the reservation, as it were. This physician had reasons for the prescription. The pharmacy had no reason other than corporate dicta, corporate policy. And if there's a person in the United States who goes to Walmart for medical care, I don't know who it is. I don't know how you can say that when every professional association's backed by the Federal government's pandemic fighters are saying, this is, don't, this is bad stuff. The physician who prescribed it had reasons, and we recited the studies that they relied on. But that's not what you said. You said that this was nothing but a corporate decision making. It was a corporate decision. It wasn't a medical decision. Have you ever gone to Walmart and said to the pharmacist, my back aches, what are you going to prescribe for me? Can you check out my torn ligament? I think I'm going to die. Yeah, I've had a lot of conversations like that. Do you go to your pharmacist for diagnostic treatment? No, of course not. No one does. All right. But if you look at the policy, the policy is designed to protect the corporation and the patient, right? Because here's the deal. If you've got a professional pharmacist who is informed fully, and they have an obligation, you look at it like a pharmacist's obligation is to protect the patient. It's as much to protect the patient as it is to fill the prescription, right? If the prescription is improvident, if it's improper, if the combination of that prescription with other drugs the pharmacist knows the patient is taking is harmful, they have a legal obligation not to fill it. When they don't meet that legal obligation, the pharmacist can be sued for malpractice. Isn't the corporate policy here simply, the FDA has said this, the Minnesota Board of Pharmacy has said this, nobody is out on a limb except for a handful of people who appear to have politicized this issue, our risk of getting sued for malpractice is such that we're just not going to do it. And that would be the discretionary function. That's the Hy-Vee function, and that's why I say there's a strong claim and a weak claim for us. Hy-Vee is a weaker claim, and I concede that. But I think in the Walmart case, and I believe the regulations require a look back to the I have consulted the physician. The physician says, I am duly licensed, I have examined this person, I have concluded that this is indicated. And the pharmacist then can say no, without examining the patient, without having any doctor-patient relationship with the person. Our position is that once the look back provision takes effect, the public policy purposes and rationale are served, and that would constitute a waiver or, in effect, a limitation on the pharmacist's liability. Is there a case to say that that has happened yet? No, because I think the whole Ivermectin crisis, if you want to call it that, caught us all by surprise in COVID. But the position that the sellers advocate here is if they have a physician and the physician examines them, and they've got a doctor-patient relationship with them, they're acting within their right to privacy by waiving their right to talk to this person. They've got a right to bodily integrity. They give that person the right to inspect the body. That medical professional uses his or her judgment and prescribes something. They have a right to have that prescription filled. The pharmacist has a duty to determine it's not an error. When the pharmacist fulfills that duty by talking to the doctor, what gives the pharmacist the right to say no to the doctor? That's why, Judge Locan, I don't mean to be disrespectful to you, that's why I believe that it's an example of corporate medicine. And I understand the debate, and I might make different choices, were I the patient, but I'm here to defend a patient's right to rely upon their doctor and to assert the position that it's the pharmacist's responsibility to serve the public interest, to assure that no mistake is made. But once they've reached that conclusion, no pharmacist has a right to substitute their judgment for the physician. But you're talking about a common-law claim under Minnesota law. Yes. Right. And so, you know, hindsight's perfect. I listened to the prior argument and some of the questions, and I imagined the questions that would come up here, and I thought, okay, we should have gone to Minnesota law, to Minnesota courts. We would have had a more direct route to the Supreme Court. But I don't think this is a case — I do think, Judge Erickson, that this is a case where this Court can go out on a limb and say it's appropriate. I mean, I had in Connecticut recently a case — I realize I'm not home, but — where the Second Circuit certified a question to the Connecticut Supreme Court on the litigation privilege because it had never arisen, and it was a non-frivolous claim. Say what you will about some of crank medicine in the era of COVID. The Second Circuit likes to serve. Well, and I've liked the Second Circuit because I go there all the time, but I'm a stranger in a strange land here. You know, I would urge you to consider doing so. I don't think it's a frivolous claim. As to other claims that — and that's the marquee claim here, and just by way of review, you know, and to address your concerns, Judge Loken, we're not challenging the duty or responsibility of a pharmacist to check because we understand the important public policy considerations there. We're simply saying that once they've checked with the physician, the public policy purposes have been satisfied, and that the decision to override a licensed physician's prescription authority offends public policy and is outrageous because the pharmacist has no relationship with the patient other than to fill out the form. Their relationship with the State is the public safety function. It was satisfied when they called Dr. James. To the intentional infliction of emotional distress claim, our position is that as a physician, we have satisfied it on these facts. A man believes he's about to die. He can't get the treatment that he and his family identify as what he wants, and he's denied that treatment. I see him over my time. I neglected to look at it, so I'll stop here. You may be in your rebuttal time. Yeah, I don't want to take it. I've forgotten. This is the difference between the Second and Eighth Circuit. The Second Circuit, they give you the hook. Here, you've got to police yourself, so I'll stop to save some rebuttal time. Mr. Branningham? Thank you, Judge Loken. Good morning, Your Honors. May it please the Court, Counsel. My name is Andrew Branningham, and I'm here this morning on behalf of Appellee Hy-Vee, Inc., to respectfully urge this Court to affirm the judgment of the district court below in its entirety. Both of the claims before the Court on appeal fail for clear reasons, and there are two independent bases to affirm and to reject the claims that appellants are pressing. The first is they simply failed to plead plausible, legally cognizable claims. You just mumbled that. I missed it entirely. You're going to have to repeat it. Two independent reasons to affirm. I heard that. The first one didn't go well. They have failed to plead plausible, legally cognizable claims under Minnesota law, number one. Number two, they have failed to serve the affidavit of expert review that is required by Minnesota statute for this type of claim, for these types of claims, and their failure to do so mandates dismissal per the statute as Chief Judge Shilts properly recognized. The Salyers have focused their appeal on what I view as rather abstract arguments and rhetoric about self-determination, bodily integrity, and so forth, but what they fundamentally ignore is the right to self-determination of other people in our society, including pharmacists and other professionals, who have their own rights to determine their own conduct and how to use their professional skills and training and judgment to deliver care to patients in a manner that is appropriate and consistent with their training, with the standard of care, with their own ethics, and so on. To permit these claims to proceed, Your Honors, would have extensive, devastating implications to the health care system and to the legal regime that governs it. Cutting through the rhetoric and the abstractions, I think the Court will find, as Chief Judge Shilts did, that applying very simple, well-established Minnesota law to the facts actually pleaded in the amended complaint compels a straightforward affirmance here. That's where I want to spend a moment with you. I haven't studied the full record before the District Court, but my understanding is that you and Walmart argued and the District Court agreed that the asserted common law right does not exist because it has not been recognized. That's correct. It's not been recognized in Minnesota or any other jurisdiction. Now, are you familiar with Lake v. Walmart Stores, a Minnesota Supreme Court in 1998? I am not, Your Honor. I'll confess. Well, let me read a bit of it. The Supreme Court said, this Court has the power to recognize and abolish common law doctrines. The common law is not composed of firmly fixed rules. As society changes over time, the common law must also evolve. And then they went on to say, this involves an invasion of privacy right that had not been recognized. And they recognized three of the four rights asserted for the first time. And how did they do that? Well, they go on. The tort of invasion of privacy is rooted in a common law right of privacy first described in an 1890 Law Review article by Samuel Warren and Lewis Brandeis. So I thought about this case in this. This was a further interpretation of a famous 1909 Minnesota case called Tuttle v. Buck, where the argument was, was this Minnesota endorsing the And a case before this one said no. They were simply recognizing for the first time a tort of intentional interference with non-contractual relations. So historically, what is this case about? This is a refusal to deal case, right? That's one way to characterize it, yes. How else? Well, I know that if you look at it. It's a medical malpractice case is another way to look at it. I mean, yeah, go ahead. Yes. But the common law would look at this as a refusal to deal. And now you're on pretty good grounds because it's common law that it was a universally recognized unilateral right of merchants and others to refuse to deal or enter into contractual relations with anyone. I believe that's correct, Your Honor. We're looking good. But there were exceptions, weren't there? In refusal to deal, Doctor? There were common law exceptions. I bet you could name them. Sure. The most prominent being common carriers and innkeepers. And what was the historical reason for those exceptions? Those merchants were providing essentially needed services to travelers and those trying to sleep in rural England with few options. They were so essential that the unilateral right to refuse to deal must be subject to reasonable exceptions. Now, we start to see this, I start to see this case in a different light. So I would say your premise, the district court accepted, that the right doesn't exist because it hasn't been recognized was clearly wrong under Minnesota law. So now where do we go viewing this? What's your response to my question of why isn't this a modern exception to the right of a merchant such as a pharmacist, a drug store, to refuse to deal? My first response, Your Honor, it is absolutely true that the common law evolves. It is also true that this Court has consistently and rightly held that it is not the role of this Federal court sitting in diversity to fashion new state law, particularly where that state law expands the scope of liability. But we have to apply this case. That's right, Your Honor. And we have to undertake the inquiry. We don't have to certify. That is true. What the Court... If we do our duty as Federal judges in diversity cases, we have to look at this as we think the Minnesota Supreme Court would. That's right, Judge. And like Judge Schiltz. That, in my view, is Lake versus Walmart. So let's do the analysis. Nobody's done it for us. Do you have any thoughts this morning? Here's the question. Why would you predict that the Minnesota Supreme Court, if confronted with this question, would not revisit the common law rule? Because, Your Honor, the same reasons Chief Judge Schiltz cited. Number one, literally no jurisdiction in America has recognized the exact right that the sailors are pressing today, and that is a right to compel a health care provider to administer a treatment that is against the standard of care in their policies. Every State court, including multiple appellate courts we've cited, have rejected that right squarely, and it has involved the exact same arguments about self-determination. It would be the first time in America that any court has recognized this right, and it would be a Federal court doing it in diversity, which this Court has said it should not do. Secondly, the policy implications are devastating, and Chief Judge Schiltz identified some of those in his order, which are the potential for a rash of lawsuits and claims in which patients seek to compel health care providers to provide controversial or problematic or even dangerous treatments against the standard of care. And so it is true that the common law canon does evolve. It is, I believe, respectfully, as this Court has said, not this Court's role to do that, and as Chief Judge Schiltz said, this is not a close question. We don't, just because it is a matter of first impression certainly does not call for certification. This Court has indicated that. It's not a close question because there is no legal support for the claim. Your Honors, Mr. Rubenstein has some time, and I want to be respectful of his time as well. So unless you have questions, I'll sit down. Thank you. Thank you. Mr. Rubenstein? Thank you, Your Honor. We agree with everything that Mr. Brantingham has just told you about. I have to speak up for me. Sure. Is that better? Can you hear me? Barely. You can raise the podium, you know. Maybe you probably, no reason you wouldn't know, but. There's a switch right in front of you. There's a button there on the, yeah. Great. Thank you, Your Honor. We agree with everything Mr. Brantingham has just told you. We think that this claim should be dismissed both on the merits and for failure to submit the affidavit. I'd like to add just a couple of more points. First to clarify, there is no claim that Walmart has a policy that was not alleged. The only allegations against the Walmart pharmacist is that he declined to fill several prescriptions, and in doing so, he gave health-based reasons to both the In doing that, he acted entirely in accord with the guidance of his regulating agency, the Minnesota Board of Pharmacy. He acted entirely in accord with the overwhelming medical consensus, as was referenced earlier and referenced in footnote four of Chief Judge Schiltz's opinion. He acted entirely in accord with the actions of other health care professionals behaving independently, from Hy-Vee's pharmacist to the Iowa doctor at the clinic where Mr. Salier first visited, to the Minnesota pharmacist referenced in the Salier's appellate briefing. So when you take all of that together, it cannot possibly be said that the conduct of Walmart's pharmacist was outside the bounds of civilized community, as would be required for an IAED claim. Chief Judge Schiltz was correct in dismissing the case on those grounds. And I don't, I don't take the Salier's to be seriously disputing that anymore. The, the Tuttle v. Buck line of cases, Tuttle v. Buck makes, made liability purely on malice, which is why it raised the question whether Minnesota was following the prima facie tort. So I think the, the tort claim that I have outlined as being at least plausible here would require malice. And I think that you, you're, that's, so that, in my view, is what you're addressing. Yes, Your Honor. And there is no plausible allegation of malice here where the doctor, as Chief Judge Schiltz recognized, or excuse me, the pharmacist gave his health-based reasons. There's nothing in the record to suggest that he didn't believe them, that he was, he actually believed that the prescription should be dispensed, but wasn't doing it because of some, he didn't like their politics or he didn't like their race or something like that. Does that all, does the malice factor also bleed into the intentional interference claim? So the plaintiffs have expressly waived the tortious interference with contract claim. It bleeds into the intentional infliction of emotional distress claim, Your Honor,  Yeah, no, that, because that's an element of, of intentional interference. Yes. It's an element of intentional infliction of emotional distress, that you have to have malice and you have to have extreme and outrageous conduct. And they haven't plausibly alleged either. Your Honor, going back to the common law claim, I think the reason that Minnesota, the Supreme Court would not recognize this is both that they've already told us that it doesn't exist in Madison when they were very clear that the doctrine that stems from Kornfeld and the doctrine that stems from other places does not include the failure to treat or the refusal to treat or the failure or refusal to treat in a particular way. And beyond that, a pharmacist, to Your Honor's point, is not a mere merchant. A pharmacist, as Judge Erickson pointed out, has professional obligations. They have legal obligations. They have to ensure that the prescription is clinically appropriate and is not harmful to the patient. Nothing in Minnesota law requires that they give up that judgment or give up their reasoning simply because a doctor disagrees with them. Your Honor, I'm happy to answer any further questions you may have. Otherwise, we would respectfully ask that you affirm the decision below. I don't know that we have to go to Federal law, do we? I'm sorry? Well, we're only reviewing the denial of a common law claim. So what role does Federal law play in that question? Federal law doesn't really play a significant role in that question, Your Honor. I'm sorry if I suggested otherwise. Well, it might, depending on where State common law jurisprudence says how it had come to rely on, one or more facets of Federal law, but here we have one. Here we have a common law claim that has not yet been recognized. That's correct, Your Honor. It's not been recognized in Minnesota or in any other State or in the Federal system. So there is no reason to think the Minnesota Supreme Court might or would or really has any chance. I think there's no reason in Federal law. Or in Minnesota. Well, no, I know. But your reference to Federal law just sort of caught my ear as to, well, what's that doing here? I'm sorry, Your Honor. There's no basis in Minnesota law. There's no reason for this Court to get out in front of a State court in this fashion. No, I — well. Okay. Thank you, Your Honor. Judge Loken, I also missed Lake v. Walmart, but I'll try to rise to the challenge in a way that I think distinguishes this case and shows why it should advance at least to the Minnesota Supreme Court. Strangers with respect to one another have the law impose a — You said you were going to distinguish, Lake. I would think you'd want to hug it. Well, I'm going to hug it with a difference. Okay. Well, this is a different tort. It's the analysis. So I'm going to hug it with a difference. What does the rule of law do? It imposes obligations on strangers with respect to one another. And we are arguably at liberty with regard to one another until the law imposes obligations. The Minnesota Constitution embraces that position, Article I, Section 1, where all our rights are inherently ours. Minnesota gives a privilege to pharmacists, that is, to prescribe drugs and to make money doing it. It imposes obligations on them. When they're presented with a script that looks suspicious to them, this is on page 24 of the high-leave brief, they're obliged to contact the physician under Regulation 6800.3110. In this case, the privilege of making money from filling the prescriptions carried with it the responsibility to assure that the public health was undertaken and to contact physicians when something arose that aroused the pharmacist's suspicion. The physician did and still refuse to provide care. So in the right to refuse common carrier instance, a patient shouldn't be resorting to the open market to get Ivermectin, or as they did in this case, using a horse paste and fashioning it to their own good. That's contrary to the public health. In this case, the system worked. The pharmacist called under Minnesota law. There was the common carrier exception. In exchange for the right you have to make money filling prescriptions, you have rights and responsibilities. You have to accept the prescription. You have to accept the traveler, as it were. When the person authorizing this prescription gives you his reasons for its validity, you don't get the right to throw the patient out onto the street and say sleep under the bramble bush where the robbers can get you because you disagree with it. You weren't retained to examine the person. The person has their own physician. If there's a public policy problem here with the doctor, that's why we license them. That's why they have their appropriate standards of care. So I think Lake versus Walmart stores solved the issue for us and decidedly in our favor. Briefly, we don't think this is a medical malpractice claim. This is sawn off the wrong leg, and you don't need an opinion to say that a pharmacist who follows the law and then ignores its requirements breached, and therefore, we didn't need the certificate. Thank you.